UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH WITMER, JOSEPH OLEX,
RALPH WILLIAMSON, EDWARD
PFANNES, and RAYMOND OWENS,
     Plaintiffs,

v.                                   Case No. 08-12795

                                   Honorable Patrick J. Duggan

ACUMENT GLOBAL TECHNOLOGIES,
INC.; PLATINUM EQUITY; and
TEXTRON, INC.,
     Defendants.
_____/

**OPINION AND ORDER**

At a session of said Court, held in the U.S.
District Courthouse, City of Detroit, County of
Wayne, State of Michigan, on January 26, 2009.

PRESENT:     THE HONORABLE PATRICK J. DUGGAN
                       U.S. DISTRICT COURT JUDGE

Plaintiffs Kenneth Witmer, Joseph Olex, Ralph Williamson, Edward Pfannes, and

Raymond Owens (collectively "Plaintiffs") filed this action against Acument Global

Technologies, Inc. ("Acument"), Platinum Equity, and Textron, Inc. (collectively

"Defendants") on June 30, 2008, alleging claims under Section 301 of the Labor

Relations Management Act ("LRMA") (29 U.S.C. § 185) and Section 502 of the

Employee Retirement Income Security Act ("ERISA") (29 U.S.C. § 1132).  The claims

arise from Acument's termination of health insurance coverage to its and its

predecessors' retirees which took effect October 31, 2008.  Plaintiffs allege that, pursuant

to various collective bargaining agreements ("CBAs") and plant closing agreements, they are entitled to fully-funded, lifetime healthcare benefits.  Presently before the Court are Plaintiffs' Motions for Class Certification, Preliminary Injunction, and Summary Judgment as to Liability.  The motions have been fully briefed and the Court held a hearing on December 23, 2008.

## I. Factual and Procedural Background

Prior to 1998, Ring Screw Works, Inc. owned and operated five manufacturing divisions relevant to this case: Ring Screw, Ferndale Fastener, Ring Heat Treat, Warren Processing, and Steel Processing (collectively "divisions").  Defendant Textron purchased Ring Screw Works and these manufacturing divisions in 1998.[1]  In 2001, however, Textron closed the Warren Processing and Steel Processing Divisions followed by Ferndale Fastener in 2003 and Ring Screw in 2004.  In 2006, Textron sold what remained of Ring Screw Works to Platinum Equity.  Platinum Equity, in turn, established Acument to operate its new acquisition.  Acument closed the Heat Treat Division in 2007. Although the ownership changes and staggered closings of the divisions appear complicated, Acument concedes that it "assumed substantially all of the assets of [Textron], including employment and labor-related obligations . . . ."  (Defs.' Resp. to Pls.' Mot. for Summ. J. at 3.)

---

[1]After acquiring Ring Screw Works, Textron operated the divisions under two different names.  For simplicity, the Court will refer only to "Textron."

The employees at the five divisions were represented by the UAW and its Local 771 ("UAW").  Dating back to at least 1974, the UAW negotiated a series of CBAs with Ring Screw Works and its successors.  Although the CBAs were independently negotiated for each of the divisions, the parties agree that each series of CBAs contains nearly identical language to the others.  In addition to other terms, the CBAs included provisions relating to a "Pension Plan," "Retiree Medical Coverage," and "Continued Life Insurance." Under the article titled "Pension Plan" the CBAs state in relevant part:

> The Company reserves the right to amend, modify, suspend, or terminate the Plan provided, however, that no such action shall alter the Plan or its operation . . . in respect of the employees who are represented under a collective bargaining agreement in contravention of the provisions of any such agreement pertaining to pension benefits as long as any such agreement is in effect.
> Principal provisions of the pension plan are shown below.[2]

One of the sub-headings appearing "below" is "Retiree Medical Coverage" and the following language:

> Continuous health insurance and prescription drug coverage will be available to current retirees and those who elect early retirement with fifteen (15) years of service at age sixty-two (62) or twenty five (25) years of service at age sixty (60) and regular retirement with fifteen (15) years of service who are sixty-five (65) years of age or older.  This coverage is available for the spouse of retirees only during the life of the retiree, except as provided below.  To be eligible for this benefit, retirees may not be employed full time when Medical/Rx coverage is available.
> Retirees will be required to apply for Medicare parts (A) and (B).  The company will reimburse the retiree for the maximum of the current

---

[2]While this excerpt is taken from Article XXVIII of the February 8, 2004, CBA for the Ring Screw Division, (Pls.' Mot. for Summ. J. Ex. 10), identical provisions appear under the same headings in all of the CBAs.

3

monthly cost of Medicare part (B) coverage either directly or from the pension fund at the option of the Company. Eligible employees hired after 12/31/99 will be ineligible for retiree healthcare benefits, except the reimbursement for Medicare part (B) which will be capped at the monthly rate of $45.50. Eligible employees hired before 12/31/99 will be eligible for healthcare through an HMO or PPO plan available at the option of the Company. (Benefits will be coordinated with Medicare and all benefits will cease upon death of retiree, unless retiree's spouse is under sixty-five (65) years of age, in which case benefits for the spouse and dependent children of the retiree, will not cease until spouse remarries or reaches age sixty-five (65).[3]

Also "below" the "Pension Plan" heading is "Continued Life Insurance" which states:

"Continued life insurance shall be provided for employees who are retired under the pension plan in the amount of $12,000.00. Retired employees will be permitted to purchase additional insurance by buying an individual policy up to maximum of $38,000 currently without a medical examination at the insurance company's rates."[4]

---

[3]Again, this excerpt is taken from Article XXVIII of the February 8, 2004, CBA for the Ring Screw Division. (Pls.' Mot. for Summ. J. Ex. 10.) The "Retiree Medical Coverage" provision did change slightly over the years. When the CBAs began in the 1970s, they generally provided health insurance coverage for early retirees and some reimbursement for Medicare Plan B. In the 1980s the CBAs added health insurance coverage for retirees equal to that provided for active employees, described this coverage as "continuous," increased the reimbursement payments for Medicare Plan B to "current cost," and added coverage for spouses of retirees. In 1997 the CBAs added coverage for certain *surviving* spouses and in 2000 the CBAs introduced the language regarding employees hired before 12/31/99. None of the parties have argued that these variations affect the determination regarding whether healthcare benefits vested upon retirement for Plaintiffs and their spouses.

[4](Pls.' Mot. for Summ. J. Ex. 10.) Over the years, the amount of life insurance provided increased from $500 to $12,000. The option to purchase additional coverage became available in 1997. Both parties mention life insurance coverage in their briefs but their arguments focus on healthcare benefits.

4

In addition to the CBAs, the UAW negotiated plant closing agreements for each of the divisions that included a provision acknowledging the pension rights for all retirees as defined in the most recently executed CBA for that division. Additional memorandums and addendums to the plant closing agreements specifically named nine employees considered eligible for retirement benefits as defined in the CBAs.

The named Plaintiffs in this case are former hourly employees of Acument and its predecessors who retired under the various CBAs and agreements described above: Kenneth Witmer retired from the Ring Screw Division in 1996, Joseph Olex retired from the Ring Screw Division in 2004, Ralph Williamson retired from the Ring Screw Division in 2000, Edward Pfannes retired from the Ferndale Fastener Division in 2003, and Ray Owens retired from the Ferndale Fastener Division in 2003. These men and other retirees continued to receive health coverage as described in the CBAs until the end of 2007. Effective January 1, 2008, however, Acument reduced healthcare benefits for retirees and surviving spouses. Then, in May 2008, Acument announced its intent to terminate retiree healthcare benefits. This change took effect October 31, 2008.

Plaintiffs filed this lawsuit on June 30, 2008, seeking reinstatement of health care benefits to the pre-January 1, 2008, level for themselves and all other retirees and eligible surviving spouses. Plaintiffs filed their Motion for Class Certification on October 10, 2008, and their Motion for Summary Judgment as to Liability the next day. On October 30, 2008, they filed their Motion for a Preliminary Injunction. For ease of analysis the

5

Court will first address class certification, followed by the preliminary injunction, and,

finally, summary judgment.

## II. Class Certification

Rule 23 of the Federal Rules of Civil Procedure sets forth two sets of prerequisites

for class certification.  Rule 23(a) states that a class action may be maintained "only if"

the following four requirements are met:

> (1) the class is so numerous that joinder of all members is impracticable,
> (2) there are questions of law or fact common to the class,
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  In addition, Rule 23(b) provides that an action may be maintained

as a class action only if:

> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy . . . .

6

Fed. R. Civ. P. 23(b).

**A. Numerosity**

Although Rule 23(a)(1) requires that a proposed class be so numerous as to make joinder impracticable, "[i]mpracticability of joinder is not determined according to a strict numerical test . . . ." *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 523 n.24 (6th Cir. 1976). Rather, numerosity "requires examination of the specific facts of each case . . . ." *Gen. Tel. Co. of the N.W., Inc. v. EEOC*, 446 U.S. 318, 330, 100 S. Ct. 1698, 1706 (1980). In addition to the number of proposed members, then, courts commonly consider such factors as the ability of the members to bring individual law suits and whether class certification would promote judicial economy. *See Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 56 (N.D. Ill. 1996).

Plaintiffs' proposed class consists of 64 members.[5] Plaintiffs argue that joinder of these members is impractical for several reasons: the class members are geographically dispersed between several states and Canada, the class members live on fixed incomes that limit their ability to bring individual law suits, and, because the class members are elderly, they may not understand or physically be able to initiate a lawsuit at this time. In regard to judicial economy, Plaintiffs also argue that each of the class members are entitled to the same declaratory relief which can be best administered in a single suit.

---

[5]Although Plaintiffs estimate a class size of 50 members, Defendants respond with a breakdown of the retirees from each of the divisions amounting to 64 members: 39 members from Ring Screw, 23 members from Ferndale Fastener, one member from Steel Processing, one member from Heat Treat, and zero members from Warren Processing.

7

Focusing on the number of members in proposed subclasses,[6] Defendants argue that there are simply too few class members to justify certification.  In determining whether the numerosity requirement is met, however, the Court considers the entire class and need not break it down to proposed subclasses.  *See Sanft v. Winnebago Indus. Inc.*, 214 F.R.D. 514, 522 (N.D. Iowa 2003).  Ultimately, case law supports Plaintiffs' arguments and the Court agrees that joinder of all the proposed class members is impracticable in this case.  *See Novella v. Westchester County*, 443 F. Supp. 2d 540 (S.D.N.Y. 2006) (certifying a class of 24); *Gaspar*, 167 F.R.D. at 56-57 (certifying a class of 18); *Rodger v. Elec. Data Sys. Corp.*, 160 F.R.D. 532, 536-37 (E.D.N.C. 1995) (certifying a class of 57).  Therefore, Plaintiffs' have met the numerosity requirement.

**B. Commonality and Typicality**

Rule 23(a)(2)'s commonality requirement "simply requires a common question of law or fact."  *Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 884 (6th Cir. 1997).  As the Sixth Circuit subsequently explained: "'The interests and claims of the various

---

[6]Plaintiffs propose three subclasses: one for those who retired under the CBAs, one for the individually named employees in the plant closing agreements, and one for eligible surviving spouses.  Defendants propose four subclasses based on the division in which the retiree worked.  It remains unclear to the Court why there is a need for any subclasses at this point in the litigation; the parties do not argue that any of the retirees or surviving spouses should be treated differently.  As presented to the Court, the single issue is whether healthcare benefits vested under the terms of the CBAs and the parties' arguments in regard to this issue do not depend on where the retirees worked, which CBA or plant agreement controlled, or whether a plaintiff is a surviving spouse versus a retiree.  If the Court later determines that sub-classes are necessary, they will be created at that time.

plaintiffs need not be identical.  Rather, the commonality test is met when there is at least

one issue whose resolution will affect all or a significant number of the putative class

members.'" *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 424 (6th Cir. 1998)

(quoting *Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101, 1106 (5th Cir. 1993)).  In

*Forbush* the Fifth Circuit found commonality even though the potential class was covered

by four different pension plans.  *Id.*  Similarly in *Bittinger*, the Sixth Circuit found

commonality where retirees sought guaranteed lifetime, fully-funded benefits, even

though a series of different CBAs governed those benefits.  *Bittinger*, 123 F.3d at 879,

884.

Meanwhile, Rule 23(a)(3)'s typicality requirement demands that the representative

be a member of the class and share at least a common element of fact or law with the

class.  *Senter*, 532 F.2d at 525.  Like the test for commonality, the test for typicality is not

demanding and the interests and claims of the various plaintiffs need not be identical.[7]

*Bittinger*, 123 F.3d at 884.  The Sixth Circuit has explained the typicality requirement as

follows:

> "Typicality determines whether a sufficient relationship exists between the
> injury to the named plaintiff and the conduct affecting the class, so that the

---

[7]The Sixth Circuit has recognized that the commonality and typicality
requirements "tend to merge," and that "[b]oth serve as guideposts for determining
whether . . .  maintenance of a class action is economical and whether the named
plaintiff's claim and the class claims are so interrelated that the interests of the class
members will be fairly and adequately protected in their absence."  *Rutherford v. City of
Cleveland*, 137 F.3d 905, 909 (6th Cir. 1998) (quoting *Gen. Tel. Co. of the S.W. v.
Falcon*, 457 U.S. 147, 157 n.13, 102 S.Ct. 2364, 2370 n.13 (1982)).

court may properly attribute a collective nature to the challenged conduct. In other words, when such a relationship is shown, a plaintiff's injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff. Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory."

*In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996) (quoting 1 Herbert B. Newberg & Alba Conte, Newberg On Class Actions, § 3-13, at 3-76). A representative's claim remains typical, then, even where the evidence relevant to his or her claim varies from other class members, some class members are subject to different defenses, and the members suffer varying levels of injury. *See Bittinger*, 123 F.3d at 884-85.

Although Defendants dispute the existence of commonality and typicality on grounds that the class members retired under different CBAs independently negotiated for different manufacturing divisions, they later concede that the CBAs contain "almost identical language."[8]  As the Sixth Circuit made clear in *Bittinger*, the existence of different CBAs will not preclude the existence of commonality and typicality. In this case, those requirements are met because the rights of the class members depend on the resolution of a common question–whether retiree healthcare benefits vested under the common language of the CBAs–and because Plaintiffs' alleged injuries derive from conduct applied to all members of the class–Acument's decision to reduce and then terminate healthcare benefits to retirees and surviving spouses.

---

[8]*Compare* Defs.' Resp. to Pls.' Mot. for Class Cert. *with* Defs.' Resp. to Pls.' Mot. for Summ. J. as to Liability.

**C. Adequacy**

In *Senter*, the Sixth Circuit identified two criteria for determining whether adequacy of representation is satisfied: "1) [t]he representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute interests of the class through qualified counsel." *Senter*, 532 F.2d at 525 (citation omitted). As discussed above, the Court finds that the named representatives have common interests with the members of the proposed Class. With respect to the second criteria, Defendants have not challenged the competency or desire of Plaintiffs or their counsel to prosecute the interests of the Class, nor does the Court believe that it would have any basis to do so.

**D. Rule 23(b)**

Plaintiffs seek class certification pursuant to Rule 23(b)(1) or (2). The Court finds that certification under either subsection is appropriate. As to Rule 23(b)(1), there is a risk of inconsistent results if the retirees and surviving spouses file individual lawsuits to challenge Acument's reduction and subsequent termination of health benefits. As to Rule 23(b)(2), Acument has terminated healthcare benefits to all members of the proposed class on grounds that it retained the right to terminate those benefits. If Plaintiffs prove that their right to healthcare benefits vested under the terms of the CBAs, declaratory relief will be appropriate with respect to the class as a whole.

For the above reasons, the Court finds that the requirements for class certification set forth in Rule 23 are satisfied.

11

## II. Preliminary Injunction

To determine whether to grant Plaintiffs' motion for a preliminary injunction, the Court must consider four factors: (1) Plaintiffs' likelihood of success on the merits; (2) whether Plaintiffs will suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest. *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996). The Court must balance all four factors. *Id.* "None of these factors, standing alone, is a prerequisite to relief . . . ." *Id.*

## A. Likelihood of Success

Plaintiffs are likely to succeed in this action only if the relevant CBAs guaranteed them a vested right to receive fully funded, lifetime healthcare benefits. A retiree healthcare benefit plan is a welfare benefit plan under ERISA. *Maurer v. Joy Tech., Inc.*, 212 F.3d 907, 914 (6th Cir. 2000). Unlike pension plans, welfare benefit plans are not subject to mandatory vesting requirements under ERISA. *Id.* Thus courts have held that "after a CBA expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to that CBA." *Bittinger v. Tecumseh Prod. Co.*, 83 F.Supp.2d 851, 857 (E.D. Mich. 1998) (quoting *Am. Fed'n of Grain Millers v. Int'l Multifoods*, 116 F.3d 976, 979 (2d. Cir. 1997)). The parties to a CBA may agree, however, that the benefits provided for in the CBA will vest and thus survive the termination of the CBA. *Maurer*, 212 F.3d at 914. If the parties intended the

benefits to vest for the lifetime of the retirees, the employer's unilateral modification or reduction of those benefits will constitute an LRMA violation.  *Id.*

The Sixth Circuit Court of Appeal's decision in *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (1983), sets forth the guiding principles for determining whether the parties to a CBA intended retiree health insurance benefits to vest.  Pursuant to these principles, courts must apply basic rules of contract interpretation to discern the intent of the parties:

> [T]he court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent. . . . The court should also interpret each provision in question as part of the integrated whole.  If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties. As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises. Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance. . . . Finally, the court should review the interpretation ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy.

*Id.* at 1479-80 (citations omitted).  As the *Yard-Man* Court further advised, courts should look to extrinsic evidence to determine the parties' intent only when the terms of the contract are ambiguous.  *Id.* at 1480.

In this case, the Court need not look beyond the express language of the contract to determine the parties' intent.  Plaintiffs argue that healthcare benefits vested under the terms of the CBAs because under the subheading "Retiree Medical Coverage" the following words and phrases appear: "continuous," "during the life of the retiree," "benefits will cease upon death of retiree," and "benefits for the spouse and dependent

13

children of the retiree will not cease until spouse remarries or reaches age sixty-five

(65)."  The Sixth Circuit has previously interpreted similar words and phrases, among

other evidence, to support findings that the parties intended retiree healthcare benefits to

vest.  *See Noe v. PolyOne Corp.*, 520 F.3d 548, 559-64 (6th Cir. 2008) (discussing the

phrases "shall continue until the individual's death" and "surviving spouse shall continue

to receive the [benefit] until such spouse remarries, dies or is no longer eligible"); *Policy*

*v. Powell Pressed Steel Co.*, 770 F.2d 609, 614-16 (6th Cir. 1985) (discussing the phrase

"during the life of the pensioner at no cost to the pensioner").  *But see Sengpiel v. B.F.*

*Goodrich Co.*, 156 F.3d 660, 668 (6th Cir. 1998) ("Somewhat more persuasive but also

insufficient to convey a clear intent to vest is language in the plans providing that a

retiree's spouse will continue to receive benefits after the retiree dies 'until death or

remarriage.'").

Even so, that is not the end of the inquiry in this case because the CBAs also

expressly include a reservation of rights clause.  Defendants argue that the reservation of

rights clause contained in the "Pension Plan" article of the CBAs allows them to "amend,

modify, suspend, or terminate" Plaintiffs' healthcare benefits at any time after the CBAs

expire.  Plaintiffs counter that, based on its location in the CBAs, the reservation of rights

clause applies only to the "Pension Plan" and that "Retiree Medical Coverage" is separate

from the "Pension Plan."  This argument ignores the express language of the CBAs and

plant closing agreements.

Focusing on the three paragraphs preceding the reservation of rights clause in the CBAs, Plaintiffs assert that the "Plan" in the reservation of rights clause is the "pension plan established in 1955" and does not include retiree healthcare benefits. Looking at the *entire* preamble for the "Pension Plan" article, however, the Court disagrees. The preamble to the "Pension Plan" article in the CBAs contains five paragraphs: the first three cited by Plaintiffs, the fourth consisting of the reservations of rights clause, and the fifth which Plaintiffs conveniently ignore. The single-sentence paragraph that follows the reservation of rights clause states: "Principal provisions of the pension plan are shown below." Included in the items "shown below" are the provisions for "Retiree Medical Coverage" and "Continued Life Insurance."

Language contained in the plant closing agreements and the memorandums and addendums attached thereto provide further support for an interpretation that includes healthcare and life insurance benefits in the "Pension Plan." Indeed, some of the Plaintiffs depend on such an interpretation because they retired under plant closing agreements that made no explicit mention of healthcare benefits but merely extended the "pension" rights as defined in the most recent CBA for their divisions. (*See* Pls.' Mot. for Summ. J. Ex. 25, 29.) If the "Pension Plans" in those CBAs do not include healthcare benefits, those retirees have no claim to assert in this litigation–which certainly contradicts the arguments Plaintiffs' counsel makes outside of the context of the reservation of rights issue. Furthermore, the Addendum to the Ferndale Fastener Plant Closing Agreement explicitly provides that the healthcare benefits are a part of the overall

15

"Pension Plan" package: "The employees listed below will be considered eligible for the retirement benefits as defined in Appendix E of the [CBA] *including retiree medical and life insurance benefits . . . .*"  (Pls.' Mot. for Summ. J. Ex. 26 (emphasis added).) "Appendix E" of the cited CBA contains the "Pension Plan" article and the preamble as described above.  The Court therefore concludes that the reservation of rights clause applies to all the rights described in the "Pension Plan" article of the CBAs including healthcare and life insurance benefits.

Plaintiffs go on to argue, however, that allowing the reservation of rights clause to control renders other promises in the CBAs illusory.  For example, Plaintiffs note that the termination of healthcare benefits upon the expiration of the CBAs would make the promise of Medicare Plan B reimbursement illusory for early retirees who do not become eligible for Medicare Plan B until after the three-year CBAs expire.[9]  This argument rests on the invalid assumption that the reservation of rights clause automatically causes healthcare  benefits to terminate upon expiration of the CBAs.  When properly understood, however, the reservations of rights clause can coexist with the promise for Medicare Plan B reimbursement.

Consistent with the rules of contract interpretation discussed in *Yard-Man*, all of the CBAs' language must be given meaning and effect if possible.  In this case, that can be

_____

[9]Although the Sixth Circuit has accepted similar arguments regarding illusory promises in support of the conclusion that healthcare benefits vested, *Yard-Man*, 716 F.2d at 1481, none of the cases cited by Plaintiffs on this issue involve CBAs or summary plan descriptions ("SPDs") that also include a reservation of rights clause.

16

accomplished by reading the CBAs to create a continuing right to healthcare benefits and Medicare Plan B reimbursement *so long as* Defendants have not exercised their right to terminate the plan.  It comes as no surprise, then, that the Sixth Circuit has consistently adopted such an interpretation when faced with nearly identical contract provisions.  *See Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 401 (6th Cir. 1998) ("We see no ambiguity in a summary plan description that tells participants both that the terms of the current plan entitle them to health insurance at no cost throughout retirement and that the terms of the current plan are subject to change."); *Musto v. Am. Gen. Corp.*, 861 F.2d 897, 906 (6th Cir. 1988) ("To read this summary as saying that the plan can never be changed in such a way as to to [sic] mandate retiree contributions for continued medical coverage is to read into the summary something its authors did not put there (a promise to provide lifetime 'paid up' medical insurance), while reading out of the summary something that clearly was put there (an express reservation of the right to change the plan).  Such a reading violates the basic principle that each provision of a contract should be interpreted as part of an integrated whole, to the end that all of the provisions may be given effect if possible."); *see also Armbruster v. K-H Corp.*, 206 F. Supp. 2d 870, 892 (E.D. Mich. 2002) (listing cases that reach the same conclusion).

Because the express language of the contract unambiguously reserves to Acument the right to terminate healthcare benefits after expiration of the relevant CBAs, the Court need not consider extrinsic evidence of intent and must conclude that Plaintiffs are unlikely to succeed on their claims against Defendants.

17

**B. Other Preliminary Injunction Factors**

Having concluded that Plaintiffs are unlikely to succeed on their claims, the

remaining preliminary injunction factors must weigh heavily in Plaintiffs' favor to justify

relief.  As it has in similar situations, the Court recognizes a serious risk of irreparable

harm to Plaintiffs.  *See Yolton v. El-Paso Tenn. Pipeline*, 318 F. Supp. 2d 455, 471-72

(E.D. Mich. 2003).  Plaintiffs live on limited incomes and many, if not most, suffer from

one or more medical conditions that require prescription medication and regular doctors

visits.  Without healthcare benefits provided by Acument, Plaintiffs may not receive the

medical care they need.

At the same time, however, the risks to Plaintiffs must be weighed against the

possible financial harm to Defendants.  Acument estimates that in October 2008 it spent

over $27,000 on healthcare premiums, Medicare Part B reimbursement, and life insurance

premiums for members of the Plaintiff class.  Although the risk of financial harm has not

been thought to outweigh the risk to plaintiffs in other cases, the fact that Plaintiffs in this

case are unlikely to succeed changes the balance of these harms.  If the Court forces

Defendants to continue coverage and Plaintiffs ultimately lose this case, Defendants are

unlikely to recover the majority of their expense from Plaintiffs' limited incomes.  In

sum, the risk of harm to Defendants combined with the unlikelihood of Plaintiffs' success

outweighs the risk of irreparable harm to Plaintiffs.

Finally, the public interest does not support a preliminary injunction in this case.

ERISA provides a policy "to protect the interests of participants in employee benefit

18

plans . . . by providing for appropriate remedies, sanctions, and ready access to the Federal Court." 29 U.S.C. § 1001(b). The LRMA favors enforcement of CBAs so as to protect the contractual rights of employees and employers. Because Plaintiffs are unlikely to succeed, a preliminary injunction would be an inappropriate remedy and would ignore the contractual rights of Acument as an employer. After considering each of the preliminary injunction factors, then, the Court must deny Plaintiffs' motion for such relief.

## III. Summary Judgment as to Liability

Plaintiffs' Motion for Summary Judgment as to Liability presents the same issues as those discussed above regarding Plaintiffs' likelihood of success. Having concluded that Plaintiffs are unlikely to succeed, the Court must also deny Plaintiffs' Motion for Summary Judgment as to Liability. As discussed above and viewing the evidence in the light most favorable to the non-moving parties–as the Court must on a motion for summary judgment[10]–the reservation of rights clause precludes the conclusion that the parties intended the health benefits to vest. Without vesting, Plaintiffs cannot succeed on either their LRMA or ERISA claims.

Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Class Certification is **GRANTED**.

---

[10]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986).

19

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Preliminary Injunction is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment as to Liability is **DENIED**.

<u>s/PATRICK J. DUGGAN</u>
UNITED STATES DISTRICT JUDGE

Copies to:
Roger J. McClow, Esq.
Donald A. Van Suilichem, Esq.